JACKIE CARTER,

                        Plaintiff,                     OPINION AND ORDER

    v.

                                                  15-cv-356-wmc

BURTON COX,

                        Defendant.

*Pro se* plaintiff Jackie Carter alleges that defendant Dr. Burton Cox, an employee of the Wisconsin Department of Corrections, violated his Eighth Amendment rights by failing to treat his serious medical needs caused by a fall in February 2015. (Compl. (dkt. #1).) Before the court is defendant Burton Cox's motion for summary judgment. (Dkt. #20.) Because the plaintiff has failed to proffer sufficient evidence for a reasonable jury to find that Dr. Cox acted with deliberate indifference to Carter's complaints of pain and other symptoms as a result of his fall, the court will grant summary judgment to defendant.

UNDISPUTED FACTS[1]

Plaintiff Jackie Carter is incarcerated at the Wisconsin Secure Program Facility ("WSPF"). Defendant Dr. Burton Cox was employed by Wisconsin Department of Corrections as a physician at WSPF during the time relevant to Carter's complaint (January 2, 2003, to August 11, 2015). In August 2015, Cox left WSPF to work full-time at another

---

[1] Based on the parties submissions and viewed in the light most favorable to plaintiff, the court finds the following facts material and undisputed unless otherwise noted.

prison. While he continued to fill in at WSPF after that time, he was no longer involved in patient management.

In 2015, Dr. Cox was treating Carter for numerous medical conditions, including chronic nerve pain. In January 2015, Cox requested authorization from his supervisor to prescribe low-dose methadone to treat Carter's chronic pain.[2] Carter does not dispute this, nor could he in light of the record evidence, but he does point out that this request pre-dates his alleged injury after falling in the shower. Nor, in light of the court's prior, extensive experience with Carter's legal claims, can he dispute that his complaints of pain extend well before 2015. (*See* Order to Proceed (09-cv-437 dkt. #39) 4 ("Carter remains in severe pain from his rectal bleeding, ankle and foot ailments and from having to go barefoot due to a lack of properly fitting shoes.").) Regardless, at the time of Dr. Cox's 2015 request, Carter was already claiming that the following medications were either ineffective to treat his existing pain or not tolerated due to side effects: gabapentin, duloxetine, topiramate, pregablin and tricyclic.[3] Carter also has a history of hypertension related to chronic kidney disease, requiring him to avoid use of nonsteroidal, anti-inflammatory drugs ("NSAIDs"), such as ibuprofen.

As context, Dr. Cox explains that, opioid prescribing standards in the corrections setting, as well as more broadly, have changed in recent years, and such drugs are generally

---

[2] Methadone is an opioid. *See* "What Is Methadone?, WebMD, https://www.webmd.com/mental-health/addiction/what-is-methadone#1.

[3] Here, too, Carter purports to dispute the fact, but the dispute seems limited to his own confusion about the timing. (Pl.'s Resp. to Def.'s PFOF (dkt. #27) ¶ 5.) Defendant's proposed fact dates back to January 2015, at which time Dr. Cox *was* providing patient management at WSPF. (*See* Def.'s Reply to Pl.'s Resp. to Def.'s PFOF (dkt. #29) ¶ 5.)

not recommended for neuropathic pain or long term chronic non-malignant pain. As a result, while Carter had been prescribed opioids in the past for his chronic nerve pain, Cox did not believe Carter's condition met the criteria for prescribing opioids at the time he submitted his 2015 request. Despite this belief, Cox submitted the request for low dose methadone because he wanted the re-enforcement that the denial by the Bureau of Health Services Medical Director could provide. Carter purports to dispute this fact on the basis that Dr. Cox told him that his hands were tied, but there is nothing contradictory about this alleged statement and Cox's alleged efforts to get the central office of the DOC to confirm his view that opioids were not appropriate. As Dr. Cox expected, the request for Carter to use opioids was denied on February 4, 2015.

On February 11, 2015, Carter had another appointment with Cox to discuss chronic pain management issues. At this appointment, Dr. Cox ordered Carter a new medication for nerve pain, along with diclofenac gel and compounded analgesic cream as topical treatment for pain in his joints and osteoarthritis.[4] Later that same day, Carter reported to the nurse that he slipped and fell in the shower.

According to the contemporaneous medical record, Carter reported hitting his head and complained of aches and pains in both elbows and one knee, but he denied losing consciousness. Still, Carter contends he also told the nurse that he was dizzy, that he lost consciousness, and that he showed her a gigantic lump on his head, while indicating that

---

[4] Here, too, Carter purports to dispute this fact, but solely on the basis that he wanted to see Dr. Cox on February 23 as well, and was denied access to him at that time. This allegation, however, does *not* raise a material dispute as to the fact that he was seen by Dr. Cox earlier in February.

his elbows, neck, back, hip, knees and shin were all really hurt.  In fairness, the nurse did note in the medical record a bruise on Carter's forehead and she told him that more bruising may appear over the next few days.  She also noted that Carter could not take NSAIDs and already had lidocaine cream.  She ordered him a refill of acetaminophen and instructed him to rest and apply ice four times per day.  Carter represents that the nurse also told him that he likely had a concussion from the fall, and that that would explain his vomiting.  While contemporaneous, the medical record reveals that the nurse did not deem any referral necessary, but rather advised Carter to submit a written request if his symptoms did not approve, Carter contends that the nurse advised that he needed immediate x-rays and would be seen the next day.

Regardless, Carter submitted a written request the next day (February 12) and he was seen by the nursing staff on February 13.  At that appointment, Carter complained of headaches and right elbow discomfort, and the nurse noted in the medical record that there was no bruising, deformity or swelling to the elbow.  Carter also disputes this, stating that he had bruising on his head, knees and elbows, and he currently has a chipped bone in his elbow.  The nurse also noted that Carter reported taking no acetaminophen since the fall, nor icing his injuries.  In response, the nurse noted specifically telling Carter about the importance of using prescribed medications and allowing time for his injuries to heal.  On that same day, February 13, Carter was also given an analgesic rub to use until his newly-prescribed creams arrived.

On February 15, Carter requested that his prescription for acetaminophen be discontinued because it makes him vomit and defecate blood. Dr. Cox granted that request and discontinued the prescription the next day.

On February 17, Carter yet again submitted a health service request complaining about pain from his fall. Two days later, on February 19, Dr. Cox responded directly to Carter advising that injuries from his fall may take a couple of weeks to heal and that some pain is to be expected. Carter does not dispute this, but points out that he had not seen Dr. Cox or any other doctor since his fall on February 11. Carter continued to submit health services requests in February, many of which were reviewed and responded to by Dr. Cox directly. During this time, Cox adjusted Carter's blood pressure medications, hoping to stabilize his blood pressure and respond to his complaints about headaches. Cox also explained that there were limited options regarding pain medication given everything that had been tried in the past and given his kidney disease. Carter challenges this fact on the basis that he is currently prescribed Tramadol, a medication Cox previously said the DOC Medical Director would not prescribe to him. In late February, Cox also approved Carter for a handicap cell due to his chronic pain and concerns about falling, and arranged for a chair that he could use at his desk and in the shower.

On March 9, about a month after his fall, Dr. Cox saw Carter in response to his March 8 health services request. The contemporaneous medical records reveal that Carter again complained of elbow and back pain. Although not reflected in those records, Carter contends that he also complained about headaches, vomiting, and hip and neck pain. Dr. Cox ordered x-rays, which were taken on March 16. The elbow x-ray was normal and

5

showed no evidence of a fracture or dislocation; a neck x-ray showed mild degenerative changes; and a lower back x-ray showed moderate osteoarthritis; and neither showed evidence of fracture or other acute changes though.

Dr. Cox saw Carter again on March 26, for a follow-up appointment for his hypertension. At that appointment, Carter mentioned his continued headaches, prompting Cox to order a CT scan of the head, which was normal. While Cox found the CT results gave no reason to believe that Carter's reported headaches were related to the fall, Carter purports to dispute this based on something he was told by a nurse to the effect that a CT scan will not show a concussion.

In April and May 2015, Dr. Cox responded to many additional health services requests submitted by Carter. For example, on May 14, due to Carter's continued complaints about neck pain, and in light of the mild degenerative changes noted in the elbow, neck and lower back x-ray, Cox referred Carter for physical therapy. Carter had five physical therapy sessions in June, but the therapist discontinued the sessions when Carter reported that therapy was making his symptoms worse.

Dr. Cox avers that based on his 15 years of medical experience, he does not believe the injuries Carter sustained during the February 11 fall were significant. Carter would dispute this as well, relying again on Dr. Cox's January 2015 request for opioids for Carter and the fact that in September 2015, he was prescribed Tramadol. As defendant points out in his reply, however, Tramadol, was prescribed to treat Carter's headaches, *not* injuries from the fall. Dr. Cox further avers that for a fall like Carter experienced, treatment of acetaminophen and ice is appropriate, although Carter declined to use either. Carter again

points out that he cannot take acetaminophen, claiming that he is allergic to it and causes extreme side effects. In reply, defendant points out that he was also given pain creams and a new pain medication for his chronic pain on February 11, earlier in the day.

OPINION

Plaintiff Jackie Carter has requested that the court recruit him pro bono counsel throughout this case, most recently in lieu of filing a response to defendant's motion for summary judgment. At that time, the court urged him to try his best to respond to defendant's proposed findings of fact, explaining that he had demonstrated the ability to take this next step in this and other cases, but that after reviewing his response, the court would reconsider his request. Carter complied and submitted responses, albeit without any citation to evidence in support. The court will nonetheless accept Carter's response as his opposing affidavit and argument, which set forth his version of the facts with respect to Dr. Cox's medical treatment of him from February 2015 through August 2015. As such, he has more than adequately represented himself.

The Eighth Amendment prohibits prison officials from showing deliberate indifference to prisoners' serious medical needs or suffering. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To state a deliberate indifference claim, an inmate must allege facts from which it may be inferred that he or she had a serious medical need and prison officials acted with deliberate indifference to that need. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). More specifically, "serious medical needs" include: (1) conditions that are life-threatening or that carry risk of permanent serious impairment if left untreated;

(2) those in which the deliberately indifferent withholding of medical care results in needless pain and suffering; or (3) conditions that have been "diagnosed by a physician as mandating treatment." *Id.* at 1371-73. A prison official has acted with deliberate indifference when the official "knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006) (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)).

For the purposes of summary judgment, the court will assume (and defendant does not dispute) that Carter has put forth sufficient evidence to satisfy the first prong of his claim -- whether Carter suffered from significant pain following the fall. As such, Carter's claim turns on the second prong -- whether Carter put forth sufficient evidence from which a reasonable jury could find that Dr. Cox "knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk." *Id.* at 396. In support of this element, plaintiff posits various theories.

*First*, Carter complains that he was not seen by Dr. Cox until his March 9, 2015 appointment, approximately four weeks after his February 11th fall. The undisputed record, however, reveals that: (1) Carter was closely monitored by the nursing staff during this period of time; and (2) on several occasions, Dr. Cox reviewed Carter's medical record and responded to his requests, communicating directly with Carter. Carter was also seen by the nursing staff on February 11, after his fall (and by Dr. Cox earlier that same day albeit before the fall) and he had a follow-up appointment scheduled two days later (on February 13). Dr. Cox also reviewed Carter's record and discontinued the acetaminophen prescription, at Carter's request, on February 16; and on February 19, Cox communicated

directly with Carter explaining that the symptoms he described from his fall were typical, and he would likely take a few weeks to heal.

Throughout February, Dr. Cox also monitored and adjusted Carter's blood pressure medication in an attempt to manage his hypertension and the resulting headaches, and he also explained that the limited pain medication options given Carter's prior reactions to a number of medication and his chronic kidney problems.  Moreover, in late February, Dr. Cox arranged for Carter to be moved to a handicap cell to address his showering concerns.

On March 9, Dr. Cox examined Carter in response to his continuing complaints, and at that time, ordered x-rays of his back and elbow to confirm that he had not suffered any fracture from the fall.  Perhaps in isolation, a four-week delay in seeing a doctor could give rise to a reasonable inference of deliberate indifference, it could not reasonably be found to have met that standard on these facts, particularly, given Carter's treatment by the nursing staff and Dr. Cox's continued monitoring of his medical record and direct responses to Carter's various requests.  Accordingly, no reasonable factfinder could conclude that Dr. Cox disregarded Carter's complaints of pain following his February 11th fall.  *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs.").

*Second*, and related to his first theory, plaintiff disputes the nurses' contemporaneous accounts in the medical records of the extent of his injuries, claiming more widespread contusions and loss of consciousness as a result of the fall.  Even crediting Carter's account, however, Dr. Cox is the defendant in this action, and there is *no* basis for imputing to Dr.

Cox knowledge of any alleged misrepresentations on the part of the nurses. In other words, plaintiff has failed to put forward any evidence to undermine Dr. Cox's reliance on the nurses' account of Carter's condition in determining the appropriate course of treatment, and specifically, his decision to delay seeing him until March 9.

*Third*, Carter complains about Dr. Cox's failure to secure methadone for him, arguing that another doctor's reported success in securing Tramadol, another opioid, in September 2015, would allow a reasonable fact finder to conclude that Dr. Cox was not diligent in treating his pain needs. As an initial matter, Carter muddles the timing with respect to Dr. Cox's request that Carter receive methadone in his response. Regardless, Cox submitted this request to the DOC Medical Director in January 2015 *before* Carter's fall, in response to Carter's chronic nerve pain issues. As such, there is nothing in the record to support a finding that Dr. Cox attempted, but was not successful, in securing an opioid prescription to treat any pain caused by Carter's February 11 fall. Moreover, the undisputed record reflects that the other doctor prescribed Tramadol (and the court will presume for plaintiff's benefit was given permission for this opioid prescription), because of Carter's ongoing headaches, which the record further reflects was related to his hypertension, or at least, Carter has failed to put forth any evidence that his headaches were related to the fall. Finally, the fact that another doctor was successful in securing an opioid prescription for Carter, some nine months *after* Dr. Cox's earlier request, does not undermine, or put into dispute, evidence that Cox made such a request *and* that the Medical Director rejected it, not Cox.

*Fourth*, Carter complains about the acetaminophen prescription given to him on the day of his fall, claiming that it caused him to vomit and have blood in his stools because he was allergic to it. As defendant explains, the medical record reflects that he cannot take *NSAIDs* given his kidney disease. In light of that, the nursing staff renewed his *Tylenol* order on the day of his fall. The record also shows that Carter did not take the Tylenol, and he requested that the prescription be canceled six days later, which Dr. Cox promptly arranged. Since the undisputed record shows Dr. Cox did *not* prescribe the Tylenol, it was not his responsibility even if such an action could give rise to a claim of deliberate indifference. Moreover, while the record reflects that Dr. Cox *had* prescribed other pain medications, even earlier in the day of this same fall, and that the nursing staff prescribed another cream to the extent there was a delay in receiving Dr. Cox's prescription cream. Given the limited pain treatment options available to Carter -- in light of his intolerance for other prescription medications and the DOC's more constrained opioid policy -- no reasonable jury would find that Dr. Cox was indifferent to Carter's complaints of pain on this record.

For these reasons, the court concludes that plaintiff has failed to raise a genuine issue of material fact that precludes the entry of summary judgment in defendant's favor. In so holding, the court has also considered whether recruitment of counsel could have resulted in a different outcome. Certainly, counsel could have been helpful in organizing plaintiff's theory of his case, but the undisputed medical record demonstrates that Dr. Cox, in collaboration with the nursing staff, appropriately responded to Carter's initial complaints of pain following his February 11th fall, or at least no reasonable factfinder

could conclude that Dr. Cox's conduct rises to the level of deliberate indifference, nor does it appear at all likely that counsel could find a reputable medical expert to opine that Dr. Cox's actions have amounted to more than negligence or, at most, gross negligence. Accordingly, the court will grant summary judgment to defendant.

## ORDER

IT IS ORDERED that:

1) Defendant Dr. Burton Cox's motion for summary judgment (dkt. #20) is GRANTED.

2) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 29th day of September, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge